## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARY ROMICH,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SEARS HOLDING CORP. et al.,** | : | **No. 12-5383** |
| **Defendants.** | : | |

## M E M O R A N D U M

PRATTER, J.                                                    NOVEMBER 4, 2013

In September 2012, Mary Romich sued Officer John Doucette of the Phoenixville, PA,
Police Department, as well as Kmart Corporation, its parent company, Sears Holding
Corporation, and two Kmart employees, Brad O'Brien and April Sweeney ("the Sears
Defendants"), under 42 U.S.C. § 1983. She alleges that Officer Doucette falsely arrested and
maliciously prosecuted her without probable cause, and that the Sears Defendants, through
conspiring with Officer Doucette, are likewise liable for malicious prosecution under § 1983.
Invoking the Court's supplemental jurisdiction, Ms. Romich also brings a defamation claim
against the Sears Defendants.

All of the Defendants seek summary judgment. Because the Court finds that, based on the
evidence that Ms. Romich musters, no reasonable juror could find that Officer Doucette lacked
probable cause to arrest and initiate prosecution of Ms. Romich or that the Sears Defendants
conspired with Officer Doucette or otherwise became state actors, the Court will grant both
Motions (Docket Nos. 17 & 18).

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The following factual background is undisputed, either by admission or by a party's failure to cite to any record evidence raising a genuine issue of material fact: "summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

In August 2011, Ms. Romich, who had worked for Kmart since 1983, served as the Assistant Store Manager at the Phoenixville, PA Kmart. She was responsible for opening and closing the store, managing the office, overseeing the clothing, and handling cash, layaway services, and checkouts. Romich Dep. 14-16 (Sears Ex. B). April Sweeney and Brad O'Brien were the store's Loss Prevention Managers. During the several weeks during which Ms. Romich and Mr. O'Brien worked together, they shared only minimal interactions, and no incidents. Romich Dep. 16:11–17:21 (Sears ¶ 15; Ex. B).

At some point, Ms. Sweeney learned from an associate that baby furniture, which Ms. Romich was responsible for setting up in accordance with Kmart's planning brochures, Haas Dep. 19:21–21:24 (Sears ¶ 9; Ex. C), had been leaving the store without being destroyed (or paid for), Sweeney Dep. 5:25–6:24 (Doucette ¶ 3; Ex. C). Kmart's policy was to destroy infant furniture once it was no longer on display in order to forestall any safety issues. Ms. Sweeney also learned that Ms. Romich might have been involved in a romantic relationship with another employee, the former loss prevention manager. Sweeney Dep., 5:22–6:20 (Sears ¶ 13, Ex. E); Sweeney Memo at SHC 0043 (Romich–Sears ¶ 13, Ex. A). For at least one of these reasons— Ms. Romich says because of the suspected affair; the Sears Defendants say because of Ms. Romich's violation of the infant furniture policy—Ms. Sweeney instructed Mr. O'Brien to

investigate Ms. Romich's conduct. *Compare* Doucette ¶ 4 *and* Sears ¶ 14 *with* Romich–Doucette ¶¶ 3-4 *and* Romich–Sears ¶ 14.

As part of this investigation, on September 13, 2011, Mr. O'Brien reviewed surveillance video footage showing the store associates' activities. Among other footage, he viewed video of Ms. Romich's opening shift on August 19, 2011. Mr. O'Brien testified at his deposition that the August 19, 2011 video showed Ms. Romich select a gold necklace out of a box from the store's jewelry counter and place it over her head. O'Brien Dep. 14:18–16:22, 26:8–28:3 (Sears ¶¶ 17-20, Ex. D).[1] Mr. O'Brien testified that he then checked the jewelry case from which he believed Ms. Romich took the necklace and, finding a watch, ring, and another necklace, concluded that it was supposed to be used as storage for empty boxes. O'Brien Dep. 25:12–26:4 (Sears ¶ 26; Ex. D); *see* Romich–Sears ¶ 26. Mr. O'Brien also examined Ms. Romich's use of her employee discount card, Shop Your Way rewards card, debit and credit card transactions, and suspected price adjustment fraud. He also learned that Ms. Romich stayed at work later than scheduled and consistently changed time-in or time-out clock punches of the employee with whom Mr. O'Brien and Ms. Sweeney suspected her of having a romantic relationship.

At some point, Mr. O'Brien called the Phoenixville Police Department to notify the police that Kmart would be conducting an interview with Ms. Romich. O'Brien Dep. 112:4-24 (Romich–Doucette ¶ 11; Ex. B). On September 20, 2011, Mr. O'Brien memorialized his interpretation of the August 19, 2011 surveillance video in an Associate Dishonesty Case Profile Report. Ex. O'Brien-17 (Doucette Ex. B). Ms. Sweeney and Nicholas Haas, the Phoenixville Store Manager, viewed the video and likewise concluded that Ms. Romich had stolen a necklace.

---

[1] Ms. Romich disputes this characterization but cites to nothing in the record to the contrary. Further, the facts as reported indicate what the Sears Defendants believed the video to show, not what it actually showed. Likewise, as discussed below, the issue with regard to probable cause is what Officer Doucette believed, not what the video actually showed.

Sweeney Statement (Sweeney 1, Sears Ex. E); Haas Dep. 10:15–11:7, 32:19–33:8 (Sears ¶¶ 22-25, Ex. C). On September 20, Ms. Sweeney, who had never met Ms. Romich before, Romich Dep. 17:4-9, 37:3-14 (Sears ¶ 42; Ex. B), called Ms. Romich to a meeting which was to be witnessed by another employee, Romich Dep. 35:4–36:8 (Sears ¶ 42; Ex. B); Sweeney Dep. 20:25–21:4 (Sears ¶ 42; Ex. E). At some point, ostensibly during this meeting, Ms. Romich wrote and signed a note regarding infant display furniture that stated, "I have let the employee take home with out [sic] cost to them and myself have taken the furniture home too." Romich 1 (Sears Ex. B). That same day, another employee also indicated that he "was aware of Mary Romich taking furniture off the infants platform [sic] and allowing associates to have it." Ex. 2 to Verified Statement of April Sweeney (Sears Ex. F).

As the September 20, 2011 interview drew to a close, Mr. O'Brien contacted the Phoenixville Police and Officer Doucette arrived at the scene. Mr. O'Brien escorted Officer Doucette to the loss prevention office where the interview was occurring. Once there, Officer Doucette informed Ms. Romich that she was being detained for retail theft, Romich Dep. 51:19-20 (Sears ¶ 56; Ex. B), and Ms. Sweeney informed her that she was being suspended from her job pending further investigation. Officer Doucette reviewed the August 19, 2011 video footage with Mr. O'Brien and Ms. Sweeney. O'Brien Dep. 127:4–129:8 (Sears Ex. D); Sweeney Dep. 29:3–23 (Sears Ex. E); Sears ¶¶ 61, 68. After showing Officer Doucette the video, Mr. O'Brien gave him a copy of the video and a picture of a gold necklace that Mr. O'Brien believed was missing. O'Brien Dep. 117:9–119:5, 127:4–21, 129:22–131:11 (Doucette Ex. B.); Incident Report at 3-4 (Romich–Doucette Ex. D). Ms. Sweeney also testified that she discussed charging Ms. Romich with theft of both the baby furniture and the necklace with the Phoenixville Police Department. Sweeney Dep. 22:5–8, 23:3–6 (Sears ¶ 59; Ex. E).

On September 23, 2011, now roughly a month after the events on the video, based on the video and statements from the Sears Defendants, Officer Doucette filed a criminal complaint against Ms. Romich for the retail theft of a gold necklace. Criminal Compl. (Doucette Ex. D; Compl. Ex. A). Along with the complaint, Officer Doucette submitted a sworn affidavit of probable cause that stated, in full:

> On 9/20/2011 I was called to 1000 Nutt Rd (Kmart) for a report of retail theft. I was informed by Loss Prevention Officer Brad O'Brien that he had observed the defendant on video take possession of a 10KT gold necklace valued at $161.99 on 8/19/2011 at 6:48am. O'Brien stated he watched the video's [sic] for that day and the defendant did not return the item and was seen walking out on video wearing the necklace. O'Brien showed me the video of the defendant taking the necklace and the defendant can be clearly seen taking the necklace.

*Id.*

On September 29, 2011, Magisterial District Judge Theodore Michaels held a preliminary hearing at which Officer Doucette and Mr. O'Brien testified. Romich Dep. 70:2-5 (Doucette ¶ 17; Ex. A). Over the continuing objection of Ms. Romich's counsel, Mr. O'Brien testified regarding his observations from the August 19, 2011 surveillance video and still pictures he took from it. Hr'g Tr. 7-8, 12 (Doucette ¶ 18; Ex. E). He testified that Ms. Romich took a necklace from a box in a jewelry case, did not return it, and later "exited the building without ever paying for that merchandise." Hr'g Tr. 8:5-6 (Doucette Ex. E). Officer Doucette then testified that he reviewed the videos and saw Ms. Romich "leaving the store with the necklace still around her neck." Hr'g Tr. 31:3-4 (Doucette Ex. E). The hearing was then adjourned until October 27, 2011.

Ms. Romich waived the remainder of her hearing when it resumed on October 27, 2011. Although Judge Michaels did not view the video himself, having received Officer Doucette's affidavit and the testimony of Officer Doucette and Mr. O'Brien, he found probable cause for the charge and bound it over for trial. A bench trial was then scheduled for February 22, 2012. *Pennsylvania v. Romich*, No. CP-15-CR-0004069-2011, Docket at 3 (Doucette Ex. G). Before

the trial date arrived, the Chester County District Attorney's Office *nolle prossed* the charges. *Id.* This suit followed.

## II.     SUMMARY JUDGMENT STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment has the initial burden of supporting its motion by reference to admissible evidence showing the absence of a genuine dispute of a material fact or showing that there is insufficient admissible evidence to support the fact. *Id.* 56(c). Once this burden has been met, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp.*, 455 F.3d at 201.

Summary judgment should be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir.1988). A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The court must not weigh the evidence or make credibility determinations. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Nevertheless, the party opposing summary judgment must support each

essential element of his or her opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Of course, the court may grant summary judgment if the plaintiff's version of the facts, as a matter of law, does not entitle her to relief: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted). Thus, the Court may grant summary judgment where, for example, no reasonable juror could find that the police lacked probable cause to arrest or prosecute the plaintiff. *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998).

## III.    DISCUSSION

Ms. Romich brings § 1983 claims against Officer Doucette for false arrest and malicious prosecution. She argues that Officer Doucette lacked probable cause to effectuate the arrest or prosecute the charge for theft of the necklace because when he reviewed "all the evidence available to him when he filed the charges" and his sworn affidavit of probable cause, "he should have entertained serious doubts as to the truth of his statements, or he had obvious reasons to doubt the accuracy of the information contained in his affidavit." Romich–Doucette Mem. at 3.

To invoke § 1983, Ms. Romich bases her claims against the Sears Defendants on a theory of their "joint action" with the police. Ms. Romich contends that Officer Doucette "conducted no investigation at all" because he had "a habit or custom of delegating his investigative duties," Romich–Sears Mem. at 2, and then "accept[ing] without question the conclusion reached by" the Kmart employees (here, Mr. O'Brien), *id.* at 4.

### A. The False Arrest and Malicious Prosecution Claims Against Officer Doucette: Did the Officer Have Probable Cause?

"The proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (alteration in original) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). A plaintiff claiming malicious prosecution under § 1983 must also show that the criminal "proceeding was initiated without probable cause." *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003). When the plaintiff "bases her malicious prosecution claim on alleged Fourth Amendment violations arising from her arrest and prosecution" for the same offense, the establishment of probable cause under the false arrest claim "also disposes of [the plaintiff's] remaining § 1983 claim [for] malicious prosecution." *Wright v. City of Philadelphia*, 409 F.3d 595, 604 (3d Cir. 2005).[2]

---

[2] Although the Third Circuit Court of Appeals limited the holding in *Wright v. City of Philadelphia*, 409 F.3d 595, in *Johnson v. Knorr*, 477 F.3d 75 (3d Cir. 2007), the issue in *Johnson* was "whether the finding that the agents had probable cause to arrest Johnson on a charge of making terroristic threats without findings that they also had probable cause for his arrest *on the other charges made against him* defeats Johnson's cause of action for malicious prosecution *on the remaining charges*." *Johnson*, 477 F.3d at 78 (emphasis added). The Court of Appeals declined to apply *Wright v. City of Philadelphia* in *Johnson* because, inter alia, it agreed with the Second Circuit Court of Appeals' analysis in *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991), "that probable cause on one charge does not foreclose a malicious prosecution cause of action against a defendant for having brought criminal charges involving different elements." *Johnson*, 477 F.3d at 78.

The court further reasoned that it did "not understand *Wright* to establish legal precedent of such broad application that it would 'insulate' law enforcement officers from liability for malicious prosecution in all cases in which they had probable cause for the arrest of the plaintiff on any one charge." *Id.* at 83-84 (citing *Posr*, 944 F.2d at 100). It explained:

> [T]here is a distinction on the one hand between a simultaneous arrest on multiple charges where, in a sense the significance of the charges for which there was not probable cause for arrest is limited as the plaintiff in the ensuing civil action could

"Probable cause is proof of facts and circumstances that would convince a reasonable, honest individual that the suspected person is guilty of a criminal offense." *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993). Though a police officer must harbor "more than mere suspicion," probable cause "does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti v. N.J. State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995). Indeed, probable cause "does not 'require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" *Reedy v. Evanson*, 615 F.3d 197, 211 (3d Cir. 2010) (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972). As the Supreme Court has explained, "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination." *United States v. Leon*, 468 U.S. 897, 914 (1984) (citation and internal quotation marks omitted). And indeed, with regard to accusations of malicious prosecution, "[p]robable cause does not depend on the state of the case in point of fact but upon the honest and reasonable belief of the party prosecuting." *Lippay*, 996 F.2d at 1502 (citation omitted).

Although the issuance of an arrest warrant by an impartial magistrate or judge does not preclude proof of lack of probable cause, when the arrest is made pursuant to a warrant, the plaintiff can only successfully challenge probable cause if he "shows, by a preponderance of the evidence: (1) that the police officer 'knowingly and deliberately, or with a reckless disregard for

---

have been lawfully arrested and thus seized on at least one charge and, on the other hand, prosecution for multiple charges where the additional charges for which probable cause is absent almost surely will place an additional burden on the defendant.

*Id.* at 84. The *Johnson* decision, therefore, does not second-guess the reasoning that a finding of probable cause for arrest on one particular charge will also establish probable cause with regard to prosecution for that same charge.

the truth, made false statements or omissions that create a falsehood in applying for a warrant' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'" *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)); *see Franks v. Delaware*, 438 U.S. 154, 171-72 (1978); *Lippay*, 996 F.2d at 1502-03.

The first element of the probable cause inquiry requires the plaintiff to furnish proof of at least recklessness. "Proof of negligence or innocent mistake is insufficient." *Lippay*, 996 F.2d at 1501 (citing *Franks*, 438 U.S. at 171). The obligation of a law enforcement officer is not to conduct a "professionally executed investigation," or even a nonnegligent one. *Orsatti*, 71 F.3d at 484. The focus is on "the information the officers ha[ve] available to them, not on whether the information resulted from exemplary police work." *Id.* Logically, it is possible that, based on what an officer knows, he may recklessly disregard the effect of the truth upon his affidavit or warrant by omission and/or assertion. *Wilson*, 212 F.3d at 783, 787.

Whether an officer recklessly disregards information by omission depends on whether he "withholds a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Wilson*, 212 F.3d at 788 (alteration in original) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). Not every fact qualifies for disclosure under this test, for "a police officer cannot be expected to present a judge with complete background." *Id.* at 788.

Proving reckless disregard through assertions, by contrast, requires demonstrating a "willingness to affirmatively distort truth." *Id.* "An assertion is made with reckless disregard when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported"— that is, the officer-affiant must have a "high degree of awareness of the statements' probable

falsity." *Id.* (citation, internal quotation marks, and alteration omitted). Thus, reckless disregard by assertion can in fact be proved in "two distinct ways": "either the affiant actually entertained serious doubts; or obvious reasons existed for him to do so, such that the finder of fact can infer a subjectively reckless state of mind." *United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011).

Recklessness is a question of fact not "involv[ing] the application of legal reasoning or judgment" because "[s]erious doubts exist or they do not; a reason for doubt exists or it does not and is obvious or is not." *Id.* Of course, the other side of the coin is that an officer may have a "sufficient grounding" to overcome any reasons to doubt the truth of his assertions not only from "first-hand observation," but also "from information provided by a third party, or from some textual source." *Id.* at 648-49.

Even if the officer's affidavit is infirm due to omissions and/or assertions made with reckless disregard for the truth, the second prong of the probable cause inquiry requires the plaintiff to show that the "statements and omissions made with reckless disregard of the truth were 'material, or necessary, to the finding of probable cause.'" *Wilson*, 212 F.3d at 789 (quoting *Sherwood*, 113 F.3d at 399). This step involves "reconstructive surgery" by the court to "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause" after the operation. *Id.* If, notwithstanding the reckless statements and omissions, the post-operation warrant would establish probable cause, then summary judgment is appropriate. *See id.*

Thus, although the question of probable cause in a § 1983 suit is generally a question of fact for the jury, summary judgment is nonetheless appropriate where no reasonable juror could find that the police lacked probable cause to arrest or prosecute the plaintiff. *Montgomery*, 159 F.3d at 124; *see Wilson*, 212 F.3d at 783 (affirming the grant of summary judgment "since none of these misstatements or omissions were material, in that the warrant would have established

probable cause even if Russo had not made them"); *Marasco*, 318 F.3d at 521-22 ("[B]ased on the information available to officers at the time the warrant was sought, there was probable cause for arrest. Because initiation of the proceeding without probable cause is an essential element of a malicious prosecution claim, summary judgment in favor of the defendants was appropriate on this claim."); *Groman*, 47 F.3d at 635; *Wright v. Altland*, 360 F. App'x 373, 375-76 (3d Cir. 2010) (affirming grant of summary judgment because "[a]lthough Wright disputes some of the information relied upon by Detective Altland, we agree with the District Court that Wright has not shown that Detective Altland had reason to doubt the information").

Ms. Romich contends that Officer Doucette lacked probable for both the arrest and initiating the prosecution because he either harbored serious doubts about the accuracy of the information or had obvious reasons to do so.[3] She asserts that "[e]ven without viewing the video" of Ms. Romich's activities on August 19, 2011, the Court can "conclude that a genuine issue exists as to what the video shows." Romich–Doucette Mem. at 3. But that is not the ultimate or determinative issue here. Rather, Officer Doucette's mental state, that is, the reasonableness of his belief, is.

Here, for Ms. Romich to prevail, she must proffer evidence such that a reasonable jury could conclude that (1) Officer Doucette recklessly disregarded the truth in his sworn affidavit for an arrest warrant *and* (2) a warrant application based on what he *should* have told the judge— i.e., with material omissions stated and reckless assertions unasserted—would not have established probable cause. *See Wilson*, 212 F.3d at 786-89. Although the Court must draw all reasonable inferences in Ms. Romich's favor at summary judgment, and Officer Doucette bears

_____

[3] As she conceded at oral argument, Ms. Romich does not argue that Officer Doucette intentionally or knowingly made false statements or omissions in his affidavit. *See also* Romich– Doucette Mem. at 3 (setting out the legal standard and then contending only that "Doucette acted recklessly . . . .").

the burden of showing an absence of a genuine issue of material fact, the probable cause issue presents a special question because, in fact, the practical presumption is already in Officer Doucette's favor because of the warrant—that is, Judge Michaels's finding of probable cause, which necessarily was based in some measure on Officer Doucette's probable cause affidavit and his testimony.

More specifically, then, Ms. Romich must either point to facts that Officer Doucette knew and which any reasonable person would have known were information that the judge would want to know, *Wilson*, 212 F.3d at 787-88, or she must suggest Officer Doucette's affirmative willingness to distort the truth by pointing to evidence that, in light of the facts that Officer Doucette knew, he must have entertained serious doubts as to the accuracy of his assertions, *id.* at 788. If she could make either of these showings, the Court would then have to turn to the materiality of the omissions or assertions.

Ms. Romich contends not that Officer Doucette intentionally falsified information in, or otherwise attempted to mislead Judge Michaels with, his affidavit, but rather that he either harbored serious doubts about the accuracy of the information he reported or had obvious reasons to do so.[4] In response to Officer Doucette's Motion for Summary Judgment, she begins by arguing, without citing any evidence in the record, that "the video does *not* show her taking 'the necklace[,'] because the item [she] can be seen to drape over her head is not identifiable as 'a 10kt gold necklace.'" Romich–Doucette Mem. at 3. Further, she argues that Officer Doucette's affidavit is not fact, but rather opinion, and that the video, which must speak for itself under the best evidence rule (Fed. R. Evid. 1002), *see* Romich–Doucette ¶¶ 6, 8, 13-14, 17;

---

[4] *See supra* note 3.

Romich–Sears ¶¶ 17-20, 63, establishes a genuine issue of material fact as to whether a statement in the affidavit was false or reckless, Romich Mem. at 3.

But Ms. Romich's problem is that she is attempting to wield the video as a shield when she would have to use it here and now as a sword. At this round, it is her burden to point either to Officer Doucette's failure to include, in his affidavit or his testimony to Judge Michaels, information of which both (a) he was aware (or would have been obvious to a reasonable person) and (b) any reasonable person would know a judge would wish to know, or facts that he knew of that would have caused him to have serious doubts about the veracity of his assertions to Judge Michaels. Thus, to the extent that Ms. Romich seeks to rely on any objective information or truth that the video might reveal to establish either what Officer Doucette omitted or recklessly asserted, she must actually point to the video—i.e., specific frames it contains—in order to show Officer Doucette's alleged recklessness. If she fails to point to evidence that Officer Doucette lacked probable cause, his evidence that Judge Michaels found probable cause will prevail. Summary judgment procedure requires at least this much of Ms. Romich as the nonmovant: she, with the burden in the overall case of proving Officer Doucette's lack of probable cause, therefore "must rebut the motion *with facts in the record*," *Berckeley Inv. Grp.*, 455 F.3d at 201 (emphasis added), that show that Officer Doucette lacked probable cause. In other words, she must find any such weak spots in Officer Doucette's armor and strike them.

But she has failed to do so. She does not contest that Officer Doucette reviewed the August 19, 2011 video footage. She points to no record evidence to rebut his statement that he believed he observed on the video Ms. Romich's taking of the necklace. Instead, Ms. Romich makes only bald assertions. For example, she argues that "the video (1) shows Plaintiff placing over her head a very long item, (2) which cannot be identified as a 'necklace', nor (3) as being an object that is 'gold.'" Romich–Sears ¶¶ 17-20, at 2. This is simply legal argument, not record

evidence; moreover, it is hardly plausible. Ms. Romich invites speculation, but what "very long item," if not a necklace, would Ms. Romich be putting over her head?

Ms. Romich also argues that the portion of the video that Mr. O'Brien and Officer Doucette say showed her leaving the store wearing the necklace is missing and that "the only video that O'Brien had was the now existing 10 minutes showing Romich at and near the jewelry case" and that "that is the only video that Doucette ever viewed before filing charges." Romich–Sears ¶ 63, at 7-8. Part of the video may be missing today, but the reasons or responsibility for that circumstance remains completely unattributed, as confirmed by the Court's questioning at oral argument. The Court can conclude nothing of significance from its absence. Moreover, Ms. Romich has not complied with *Berckley Investment Group*'s mandate that the nonmovant, to avoid summary judgment, must "put up or shut up" by citing to "facts in the record" rather than "rest[ing] solely on assertions made in the pleadings, legal memoranda, or oral argument." 455 F.3d at 201. The Defendants, by contrast, have pointed to Mr. O'Brien's testimony that he showed Officer Doucette footage of Ms. Romich leaving the store with the necklace on, *see* O'Brien Dep. 128:22–129:2 (Doucette Ex. B), as well as Officer Doucette's sworn affidavit in which he credits Mr. O'Brien's observation that Ms. Romich left the store without returning the necklace. For these reasons, the rule Ms. Romich cites from *Baptiste v. J.C. Penney, Inc.*, 147 F.3d 1252 (10th Cir. 1998), that "[o]fficers may not rely solely on a security guard's allegations when the officers have before them an exact replication," in the form of a videotape, "of all the information on which the guard's allegations are based," *id.* at 1257; *see* Romich–Doucette Mem. at 5, is inapposite.

And Ms. Romich points to no record evidence to rebut Officer Doucette's evidence that Mr. O'Brien gave him a copy of the video and a picture of the necklace that Mr. O'Brien believed was missing. Instead, Ms. Romich merely contends that the best evidence rule (Federal

Rule of Evidence 1002) protects her from Officer Doucette's characterization of or opinions based on the video. But this so-called best evidence rule—"An original writing, recording, or photograph is required in order to prove its content . . . . ," FED. R. EVID. 1002—will not help her here, for it applies when a party attempts to prove the content of a recording not before the court. But here, merely arguing that the video itself is the truth cannot show, or permit the reasonable inference, that there are any such chinks in his armor. Put another way, in invoking Rule 1002, Ms. Romich has failed to do the one thing that summary judgment requires of her: point to evidence that could establish a genuine issue of material fact such that a reasonable juror could find in her favor. But in choosing instead to cite Rule 1002, she has failed to point to anything at all.

Moreover, and for much the same reasons, Rule 1002 is no more effective as the shield with which she seeks to protect herself from Officer Doucette's characterization of the video. Rule 1002 would not preclude a jury from considering Officer Doucette's affidavit or his testimony of what he knew or thought upon viewing the video, because this testimony is about his mental state, and not offered to prove the actual content of the August 19, 2011 video, which, again, he does not in fact need to prove.

"Probable cause does not depend on the state of the case in point of fact but upon the honest and reasonable belief of the party prosecuting." *Lippay*, 996 F.2d at 1502 (citation omitted). Under the summary judgment standard, Officer Doucette need only point to the absence of a material issue regarding probable cause (his alleged statements or omissions made with reckless disregard, or the materiality thereof). Because Officer Doucette has satisfied this initial burden, Ms. Romich, by contrast, must point to *record evidence* supporting either (or both) the recklessness or materiality elements. The issue with recklessness here is not the content of the video—i.e., some objective truth about what the video captured—but rather what Officer

Doucette supposedly knew that he did not reveal to the judge in his sworn affidavit or testimony, or what he stated while knowing facts that would make him aware of the statements' probable falsity. And although the initial burden on summary judgment is borne by the moving party, who must point to the absence of a genuine dispute of material fact, Officer Doucette has carried this burden by pointing to his affidavit, and then Judge Michaels's finding of probable cause. In brief, Ms. Romich has the burden of pointing to some evidence that would establish such a mental state. And she would also have to point, further, to some evidence establishing the materiality of any reckless statements or omissions, if there were any. If the video itself would provide "obvious reasons to doubt the truth of what" Officer Doucette asserted, *Wilson*, 212 F.3d at 783, then, instead of pointing to Rule 1002, Ms. Romich would have to introduce the video into evidence herself and point to frames suggesting that Ms. Romich could *not* reasonably "be clearly seen taking the necklace," as Officer Doucette wrote in his sworn affidavit.

Indeed, Ms. Romich's evidentiary objections not only belie a misunderstanding of her burden here to point to record evidence to rebut the absence of a genuine issue of material fact, but they also evince a misunderstanding of the purpose for which Officer Doucette's and the Sears Defendants' statements referring to the video are offered: proof of mental state, rather than the content of the video themselves. Whether Officer Doucette made statements with reckless disregard depends on those facts of which he was aware; his awareness in turn—according to his sworn affidavit and deposition testimony, unrebutted by citations to record evidence—depends on what he believes he saw in the video. If Ms. Romich believes the video shows something other than what Officer Doucette repeatedly stated, she must point to it rather than attempt to hide behind a misapplication Rule 1002. *See Anderson*, 477 U.S. at 256-57 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary

judgment. This is true even where the evidence is likely to be within the possession of the

defendant, as long as the plaintiff has had a full opportunity to conduct discovery.").[5]

Ms. Romich does point to some evidence, however—namely, the apparent discrepancy in

the testimony of Mr. O'Brien and Ms. Sweeney regarding the necklace each believes she stole.

*See* Romich–Doucette Mem. at 4. But while the cited testimony might establish an issue

regarding whether Ms. Romich was already wearing a necklace when she put another over her

head and neck, or regarding the length of the necklace suspected as stolen and how far down Ms.

Romich's abdomen it extended, it cannot establish a genuine issue of material fact with regard to

whether Officer Doucette was reckless in his affidavit reporting what he saw on the video. Thus,

Ms. Romich's argument that "[i]f the two Kmart loss prevention officers cannot agree, even

today, on what the video depicts, there clearly exists a genuine issue of material fact concerning

Officer Doucette's statement in the affidavit of probable cause that Romich can be clearly seen

taking a 10kt gold necklace," *id.* at 4, misses the point.

To the contrary, according to his affidavit, Officer Doucette was told, and credited, Mr.

O'Brien's assertion that a 10 karat gold necklace was missing. He attributed the information

---

[5] Further, the substantive law points in the same direction, "for probable cause may be founded upon hearsay and upon information received from informants." *Franks*, 438 U.S. at 165; *see Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."); *United States v. Harvey*, 2 F.3d 1318, 1323 (3d Cir. 1993) ("[P]robable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." (quoting *Franks*, 438 U.S. at 165)); *cf. United States v. Currie*, No. 10-0093, 2011 WL 4916466, at *3 (S.D. Ind. Oct. 17, 2011) ("[T]here is no legal requirement that the issuing judge, in considering an application for a search warrant, be presented with and/or required to review the actual audio and video recordings of monitored communications between a confidential source and a defendant, and Defendant failed to reference any such legal foundation.").

regarding the identity or characteristics of the necklace to Mr. O'Brien. Officer Doucette's is the relevant mental state, and under both Mr. O'Brien's and Ms. Sweeney's accounts, Ms. Romich put a necklace over her head. That is what Officer Doucette stated, in his affidavit, that he saw. Officer Doucette's conclusion that the necklace in the video was a 10 karat gold necklace was clearly adopted from Mr. O'Brien, his informant.[6]

Finally, assuming, for sake of argument, that Officer Doucette was aware that Mr. O'Brien and Ms. Sweeney had differing interpretations or recollections of the length of any necklaces supposedly being tried on by Ms. Romich, their differing accounts are not material— i.e., they would not have made a difference to the establishment of probable cause. Whether Mr. O'Brien and Ms. Sweeney believe they saw the exact same necklace, or a necklace of different dimensions, has no bearing on whether Officer Doucette had any reason to think that the necklace he stated he saw Ms. Romich put over her head was any different from the one Mr. O'Brien reported stolen. Even if the Court assumes, *arguendo*, that Officer Doucette should have known to ask which necklace Mr. O'Brien or Ms. Sweeney was referring to (a noncognizable matter of negligence, in any case), Officer Doucette would still have observed, as he stated in his affidavit, Ms. Romich's putting a necklace over her head and around her neck and leaving the store with it. Ms. Romich has pointed to no record evidence to dispute this interpretation. Under

---

[6] Ms. Romich also seeks to make much of the fact that that the audit report, on which Mr. O'Brien claims he relied to help him establish that a gold necklace was missing, has not been produced, and so it is "now unavailable to the Court." Romich–Sears ¶ 27, at 3-4. She argues that "such assertions of 'fact' should be stricken . . . if offered to prove the content of a writing." *Id.* at 3. But regardless of the hearsay rules that may be at play here, the question is not the truth of what the audit report said, but whether Officer Doucette reasonably relied (as opposed to recklessly) on Mr. O'Brien's information that a 10 karat gold necklace was missing. That Officer Doucette credited Mr. O'Brien's apparent assertion that Mr. O'Brien performed or checked an audit report that led him to believe that that particular necklace was missing, without obtaining a copy of such an audit report, even if it fell below some desirable standard of police work, does not show that Officer Doucette acted recklessly by omission or assertion.

these circumstances, no reasonable juror could find that Officer Doucette had a "high degree of awareness of the . . . probable falsity," *Wilson*, 212 F.3d at 788, of his statement in his sworn affidavit that "the Defendant can be clearly seen taking the necklace."

Ms. Romich bears the burden of proving that Officer Doucette had no probable cause for the arrest and prosecution. Although that burden on summary judgment requires her only to point to something to rebut the Sears Defendants' evidence, here it requires her to point to some evidence that Officer Doucette "entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson*, 212 F.3d at 788. She has not done so. Officer Doucette's testimony, and what he swore to in his affidavit, is that in the video he saw Ms. Romich put a necklace on and not take it off. Whether she had another necklace on, or whether Mr. O'Brien or Ms. Sweeney perceived or recalled it as the same length, is not material to what Officer Doucette thought he saw.

**B. Ms. Romich's Malicious Prosecution Claim Against the Sears Defendants**

Ms. Romich also claims that the Sears Defendants maliciously prosecuted her. This claim fails because she has not pointed to evidence that would allow a reasonable juror to conclude that the Sears Defendants had engaged in state action so as to bring them within the reach of federal law, that is, 42 U.S.C. § 1983.

A plaintiff must prove two distinct elements to prevail under § 1983: He must not only "allege the violation of a right secured by the Constitution and laws of the United States," but he must also "show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); accord *Galena v. Leone*, 638 F.3d 186, 196-97 (3d Cir. 2011). This second element, which is identical to the Fourteenth Amendment's "state action" requirement, *United States v. Price*, 383 U.S. 787, 794 n.7 (1966); *Kach v. Hose*, 589

F.3d 626, 646 (3d Cir. 2009), means that § 1983 protects against constitutional violations by the state, but "not against wrongs done by individuals," *Price*, 383 U.S. at 799 (emphasis added) (citation omitted). Only where the state is responsible for the specific conduct causing the alleged harm does section 1983 apply. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141-42 (3d Cir.1995); *see Kach*, 589 F.3d at 646 ("[A] plaintiff seeking to hold an individual liable under § 1983 must establish that she was deprived of a federal constitutional or statutory right by a state actor.").

Of course, private individuals are not immune from suit under § 1983 if they engage in state action in the course of violating "a right secured by the Constitution and the laws of the United States." *Mark*, 51 F.3d at 1141. To determine whether an apparently private actor has engaged in state action, courts ask "whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Kach*, 589 F.3d at 646 (citation omitted). The Supreme Court has identified three tests for answering that question; one is relevant here: "whether the private party has acted with the help of or in concert with state officials," *id.*, a test also known as the "joint action test," *see Cahill ex rel. L.C. v. Live Nation*, 512 F. App'x 227, 230 (3d Cir. 2013).[7]

At the summary judgment stage, the plaintiff must proffer "evidence from which one could infer that [the Defendants] and [state officials] had an understanding or agreement to conspire against [the plaintiff]." *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008). A conspiracy requires a "meeting of the minds." *Id.* (quoting *Adickes v. S.H. Kress & Co.*,

---

[7] The other two inquiries are: "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state" and "whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach*, 589 F.3d at 646 (internal quotation marks and alteration omitted). Neither is applicable here.

398 U.S. 144, 158 (1970)). But suspicion and speculation are not enough—the plaintiff must offer, by "set[ting] forth specific facts," affirmative "concrete evidence from which a reasonable juror . . . could[] disbelieve the defendant's denial of a conspiracy"—and he must do so "even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 256-57.

For claims against private parties that involve "suspected shoplifters," the Third Circuit Court of Appeals has offered more specific guidance in the form of a two-part test for considering whether there has been joint action: (1) the police must "have a pre-arranged plan with the store; and (2) under the plan, the police will arrest anyone identified as a shoplifter by the store without independently evaluating the presence of probable cause," such that they have "substituted the judgment of private parties for their own official authority." *Cruz v. Donnelly*, 727 F.2d 79, 80-81 (3d Cir. 1984) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *accord Cahill*, 512 F. App'x at 230. The plaintiff's evidence of conspiracy may be either direct or circumstantial. *See Ball v. Paramount Pictures*, 169 F.2d 317, 319 (3d Cir. 1948) ("[C]onspiracy may be inferred when the concert of action could not possibly be sheer coincidence." (citation omitted and internal quotation marks omitted)).

Courts summarily reject cases when the evidence does not support the existence, or the inference of existence, of a plan on the part of law enforcement to substitute their judgment for that of private parties. At the summary judgment stage, the court asks whether a reasonable juror could infer from the circumstances whether the alleged co-conspirators reached a meeting of the minds and an understanding to achieve their objectives, *see, e.g.*, *Victory Outreach Ctr. v. Melso*, 371 F. Supp. 2d 642, 647 (E.D. Pa. 2004); *Jackson-Gilmore v. Dixon*, No. 04-03759, 2005 WL 3110991, at *12-13 (E.D. Pa. Nov. 18, 2005)—in this type of case, a plan between the store and police that the police will abdicate their duty to exercise judgment to that of store employees and

will arrest anyone fingered by the store employees. In *Cruz*, the Third Circuit Court of Appeals

affirmed the dismissal of the plaintiff's § 1983 claim against a store employee where the store

employee had ordered the police to strip-search the plaintiff on suspicion of shoplifting and the

police performed the search. 727 F.2d at 80-82. Explaining that "police normally do not take

orders from private citizens," the court held that an allegation that the store employee "'ordered

and commanded' the police officers to perform a strip search," without more, could not

justifiably be construed to suggest anything beyond "a police investigation that happens to

follow the course suggested by comments from a complainant." *Id.* at 81. The plaintiff's burden

is to point to evidence of both prongs, and so even when "sufficient evidence [exists] to satisfy

the first prong: the existence of a pre-arranged plan," the plaintiff's failure to reference "any

indication that the . . . police officers substituted their own independent judgment with that of

[the private party]" will result in summary judgment. *Cahill*, 512 F. App'x at 230-31.

Here, Ms. Romich argues that the Sears Defendants are state actors because they acted

"in concert or jointly" with Officer Doucette "to deprive [Ms. Romich] of her rights." Romich–

Sears Mem. at 6.[8] But the evidence to which she points could not lead a reasonable jury to this

conclusion.

Ms. Romich argues that the Sears Defendants had "already decided to fire" Ms. Romich,

and therefore that the only reasonable inference to be drawn from the interview between Ms.

---

[8] Ms. Romich also argues that the Sears Defendants "may be subjected to liability in a Section 1983 action where . . . they have exercised powers that are traditionally the exclusive prerogative of the State (Doucette's abdication of, and O'Brien's and Sweeney's assumption of, the investigative function)," Romich–Sears Mem. at 6, but offers no further analysis or support regarding how such an arguably different test for state action may apply. Although "[i]n the state action inquiry, more than one test may be relevant [and] the tests may overlap, and one or more prongs of one test may be irreconcilably inconsistent with the prong of another," *Pugh v. Downs*, 641 F. Supp. 2d 468, 472 (E.D. Pa. 2009) (citation and internal quotation marks omitted), she has not suggested why the two requirements from *Cruz*, 727 F.2d 79, which apply to situations where private parties reach out to police regarding suspected shoplifters, do not control here.

Sweeney and Ms. Romich is that it "was conducted for purposes of trying to obtain inculpatory statements from Romich for use by the police in the criminal case." Romich–Sears ¶¶ 41-47. Thus, Ms. Romich would have the Court conclude, "these Defendants acted as agents for the police." *Id.* But this conclusion cannot reasonably follow from Ms. Romich's premises. Even if the inference were true that the Sears Defendants were trying to incriminate Ms. Romich in order to fire her—a statement unsupported by any citations to record evidence—it would have no relevance to the questions of whether (1) the police and the Sears Defendants had a pre-arranged plan or (2) under such a plan the police would exchange their judgment for that of the Sears Defendants. The issue is not the Sears Defendants' motives, but rather whether they had a meeting of the minds with the police—a pre-arranged plan—to arrest suspected shoplifters, like Ms. Romich, without any probable cause or investigation. The issue is therefore whether *Officer Doucette* (or the Phoenixville Police Department) *agreed* with the Sears Defendants (or Kmart's management) to arrest Ms. Romich without exercising any independent judgment, not whether the Sears Defendants were trying to pin allegedly false charges on Ms. Romich to facilitate her dismissal.

In fact, Ms. Romich as much as admits that Officer Doucette *did* exercise independent judgment. She states that "[t]he police properly declined to criminally prosecute" Ms. Romich for taking or allowing other employees to take home display infant furniture. Romich–Sears ¶¶ 48-51. Indeed, the criminal complaint filed by Officer Doucette only charges Ms. Romich with theft of the necklace, even though Ms. Sweeney discussed with the Phoenixville police the idea of charging Ms. Romich with theft not only of the necklace, but also of the baby furniture. Sweeney Dep. 22:5–23:6 (Sears ¶ 59; Ex. E). This is evidence of an absence of coordinated conduct.

Attempting to establish an issue of material fact with respect to the existence of a plan or agreement, Ms. Romich points to a few other pieces of evidence. First, she notes that Mr. O'Brien testified that he notified the police before Ms. Sweeney's interview of Ms. Romich that such an interview was going to take place. Romich–Sears ¶ 52. But "merely calling the police, furnishing information to the police, or communicating with a state official does not rise to the level of joint action necessary to transform a private entity into a state actor." *Cooper v. Muldoon*, No. 05-4780, 2006 WL 1117870, at *2 (E.D. Pa. Apr. 26, 2006) (citing *Moore v. Mktplace. Rest., Inc.*, 754 F.3d 1336, 1352-53 (7th Cir. 1985)); *accord Watson v. Haverford Twp. Police Dep't*, No. 10-6731, 2011 WL 2200306, at *3-4 (E.D. Pa. June 6, 2011); *Luck v. Mount Airy No. 1, LLC*, 901 F. Supp. 2d 547, 562 n.7 (M.D. Pa. 2012) ("We do not assign much weigh[t] to the fact that plaintiffs allege that Defendant Tasetano said he was calling the Pennsylvania State Police. We agree with defendants that the mere fact that a private actor called the police does not transform him into a state actor.").

Finally, Ms. Romich also references the Sears' Defendants allegation of fact, which states in full, that "Officer Doucette entered the loss prevention office and told Plaintiff that she was being detained for retail theft." Sears ¶ 56. Based on this evidence, Ms. Romich asks the Court to draw the inference that "Doucette told Romich she was being 'detained for retail theft[,'] i.e.[,] arrested for a crime, and he told her that *before* ever exchanging a single word with O'Brien or Sweeney," and therefore that the Defendants had agreed to a plan with a share understanding. Romich–Sears ¶ 56; *see also* Romich–Sears Mem. at 2, 4. She argues that Officer Doucette's announcement indicates that he "did not conduct an independent investigation, but rather accepted without question the conclusion reached by Brad O'Brien" and "is sufficient to create an inference . . . of a course of conduct reflecting an agreement between Kmart and the

Phoenixville police that the police regularly delegated to Kmart investigative duties." Romich–Sears Mem. at 4.

But this proposed chain of inferences is not reasonable; it is far too speculative and attenuated to support any reasonable juror's inference that the elements of the *Cruz* test have been met. First, Ms. Romich offers no record evidence to support her conclusion that Officer Doucette was actually arresting Ms. Romich, or was telling her that he was doing so, when he made this comment. To the contrary, Ms. Romich left the store—i.e., she was not arrested—after the interview (a fact the parties do not dispute). *See* Sears ¶ 58; Romich–Sears ¶ 58. Officer Doucette did not file the criminal charge against Ms. Romich until three days later, after which point he had reviewed and received video footage and a picture of the necklace that Mr. O'Brien and Ms. Sweeney told him they suspected Ms. Romich of stealing. Given these unrebutted facts, no reasonable juror could infer that Officer Doucette's statement meant that he had decided to arrest Ms. Romich the moment he walked into the room (as opposed to meaning that he was informing her that she was in the process of being interviewed regarding a suspected retail theft). Nor does Ms. Romich point to any evidence to support her statement that Mr. O'Brien had not exchanged "a single word" with Officer Doucette. To the contrary, the parties do not dispute that Mr. O'Brien escorted Officer Doucette to the interview room.

Moreover, Ms. Romich has pointed to no evidence that Officer Doucette "unquestioningly relied on the 'investigation' conducted by the Sears Defendants in deciding to charge Romich." Romich–Sears ¶ 56. The parties do not dispute that Officer Doucette reviewed video footage and received a picture of the necklace the Sears Defendants told him they believed was missing. They do not dispute that Officer Doucette did not charge Ms. Romich with any offense related to the display infant furniture, notwithstanding Ms. Sweeney's discussion with Officer Doucette. In sum, Ms. Romich has pointed to nothing to establish a genuine issue of

material fact regarding Officer Doucette's alleged agreement to a plan with the Sears Defendants to "arrest anyone identified as a shoplifter by the store without independently evaluating the presence of probable cause." *Cruz*, 727 F.2d at 81. None of the evidence to which Ms. Romich points comes close to "clear evidence of [Officer Doucette's] habit or custom of delegating his investigative duties." Romich–Sears Mem. at 2.

Because Ms. Romich has not cited to evidence that would permit a reasonable juror to find a conspiracy between the Sears Defendants and the police, her § 1983 malicious prosecution claim against the Sears Defendants must fail.

*   *   *

The Court declines to exercise supplemental jurisdiction over Ms. Romich's defamation claim.

**CONCLUSION**

For the foregoing reasons, the Court will grant the Defendants Motions for Summary Judgment. An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge